May it please the Court, Josh McDaniel on behalf of ProBuilders Specialty Insurance Company. I'd like to request five minutes for rebuttal. The insurance policies in this case do not depart from the well-settled general rule that in a case of property damage, the term per claim in a per claim deductible means the insured owes one deductible for each damaged property. And, in fact, the the Is that in the insurance policy? Yes. What you just said. What you just said. Yes. Can you point that, point me to the exact language in the policy? Yes, I'd be happy to, Your Honor. So on excerpts of record, page 44, is an example of the per claim deductible endorsement. Which policy is that? This is the first policy. And other than the deductible amount being $4,000 in this case, in this policy and $10,000 in the other policies, the endorsement is the same in each policy. And specifically, there's two provisions in this per claim deductible endorsement that clarify things here. There's first in that prefatory paragraph where it says $4,000 shall be deducted from each and every claim under this policy irrespective of the number of claims which may be joined in any one suit. Several courts have interpreted similar language to mean that per claim means per damaged property. The Evanston case was one example. But, no, you just said that when you started out in answer to Judge Kuta's question, she asked you to point me to the specific language in the policy that said per house. Per damaged property. I'm looking for that in the policy.  It doesn't. So the policy is written in more general terms than that. It doesn't say per damaged house. So there's nothing in the policy that says per damaged property or per damaged house. Is that correct? That's correct. It doesn't say house or property. Okay. And the other key paragraph here is paragraph 5 of that per claim deductible endorsement. It says as respects coverages A, B, and C. And what I would point out there is coverage A would be the coverage for property damage, which is the relevant coverage in this case. So as concerns the coverage for property damage, the deductible applies equally to all damages sustained by any one person or organization as a result of any one claim. So when I looked at damages in the insuring clause, it refers to tort damages. So it refers to tort damages for bodily injury or property damage. And so when I see applies equally to all damages, it sounds like it's referring to the insuring clause, which refers to tort damages. That's correct, Your Honor. Is that correct? Yes. And that would be the underlying property damages that were suffered by the homeowners in this case. So the so here we have three complaints. So from Lenox to Yarborough, correct? Correct. Three complaints. And each complaint, the definition of claim includes complaint. And so I'm trying to understand this five, so this part of the endorsement. And I found the language very confusing, and so I'm hoping you can walk me through it. So the deductible applies equally to all damages, which we know is tort damages, sustained by any one person. And so my question is, why isn't that Lenox? The reason why it's not Lenox is because Lenox did not sustain any covered property damages or even any damages in this case. As you pointed out, the insuring clause refers to the tort damages and the property damage, and that was only sustained by the 636 homeowners in this case. Okay. So read to me, walk me through this five. Sure. And explain to me what that means or how you interpret it. Sure. And so you really honed in on the key question in this case, which is when it says person or organization, in this case, would it be referring to Lenox homes? Let's start with the deductible we know is for $10,000. Correct. Applies equally. What does the word equally mean there? I think it might be saying to all types of damages of that one person or organization. I can't remember the word equally because I found that confusing. So the deductible applies to all damages sustained by any one person or organization. And so you're saying that the tort damages were not sustained by Lenox? No. They were not sustained by Lenox. And Lenox's complaint makes very clear that it was passing through the liability that of these claims that were raised by the 636 homeowners. It was passing through these claims. Right. But there's no pass-through liability in the insurance contract. I didn't see any language about pass-through. Well, the insuring clause applies broadly to tort damages, and it just — So just getting back to here, you're saying tort damages sustained by any one person? Any one person. And you're saying any one person here is the homeowner? Correct. And so what was the claim against them? No. It's any — It says, as a result, damages sustained by a person as a result of a claim. Right. So what was the claim against the homeowners? So that's to be distinguished from occurrence. Some other policies, instead of saying claim right there, they will say occurrence. But we know what the word claim means because it's defined. It's defined as a request for money damages. So the homeowners didn't get — didn't have any claim against them. I would just say that the homeowners here each had just one claim. Right. They didn't raise multiple claims. But this is the damage to the person as a result of a claim. And so the homeowners were not — didn't receive any claim. So I don't see how this applies to the homeowners at all. The reason why the language is drafted that way is in some situations, one person or organization will have multiple claims, or there will be damages arising from multiple claims. Well, we know Lennox received multiple claims from the homeowners. Lennox did receive multiple claims. But Lennox only made one claim, or actually three, I guess, to Yarborough. Right. But Lennox did not sustain any covered property damages in this case. And I guess one thing we could look to is we could look to the definition of insured contract because I think it really dovetails with the language that's in this paragraph 5. So where are you telling me to look at? Let me find that really quick. So it would be on page 68 of the excerpts of record. Which policy is that? This is the same policy, the first policy. The July — okay. So what page? 68? So page 68 of the excerpts of record. 68. The insured contract paragraph 9? Insured contract paragraph. Down at the bottom?  And what am I looking for? And what's key about this is insured contract. This is specifically referring to the indemnity context where the pro-builders agrees to cover, you know, tort damages that are passed through to the insured because they have an insured contract. So Yarborough entered into — agreed to indemnify Lennox. Yes, under an insured contract. And that's an insured contract. Yes. Okay. Yes. And the way we get here is there's that insuring clause that's written very broadly. It says we cover tort damage because of property damage. Then there's a contractual liability exclusion. But the contractual liability exclusion says we carve out insured contracts. And so that's how we get here. And what I would point out is here it says an insured contract is a contract under which you, Yarborough — or under which you assume — so this would be you, Yarborough, assume the tort liability of another party to pay for bodily injury or property damage to a third person or organization. So you just told me that Lennox didn't have tort damages. It doesn't. And here it's — Well, then, if you have tort liability but no damages, so who's — so you're saying that the contract was to assume — wasn't to assume Lennox's tort liability? Because I looked at that contract and it didn't agree to anyone. The agreement only went to Lennox. Right. And again, it traces back. So Lennox passed through the tort liability. Okay. But the pass-through language doesn't appear in the insurance contract. I would say in this — in the insured contract language, it tracks the language. When it refers to property damage, it's the property damage of a third person or organization. So you, Yarborough, assume the tort liability of Lennox to pay for property damage to the homeowner. That's exactly what the indemnity contract did. Your Honor, again, I would point out that here it says it's tort liability to pay for property damage to a third person or organization. So when it refers to the damage, it's referring to the third person or organization. And in that situation, it would be the homeowners in that case. So you assume the tort liability of Lennox in that contract, or Yarborough did, to pay for the property damage — to pay for property damage to a third person, which was the homeowner. And so how does that — so the tort liability was from the claim that Lennox made against Yarborough in one of those three counterclaims. Yes, and I would point — So why weren't there just those three claims? I don't see anything that says you count them more than that. Because in reality, Lennox Homes was passing through 636 claims. If you look at the — So you're saying it's in reality but not in the insurance contract? Well, no, I'm just saying substantively what Lennox Homes did was it gave 636 claims to Yarborough in this case. When I read the counterclaim, it just said, you know, I'm liable, so you're liable. I didn't see anything. So Lennox potentially was an additional insured, and I suppose it could have tendered the claims from the 636 homeowners directly to ProBuilders, but that's not what it did. Right. But — and again, I would also go back to the cases that we've cited in our brief. There's the Miles case that we've cited. There's the Atlas case that we've cited. There's the Kent case that we've decided. In each of those cases, there was — and especially in the Miles case, there was a remarkably similar language in that policy to the policy that we have here, and in those cases, the Court said — It didn't interpret the contract at all. I was quite shocked by that. It just said it was a matter of policy. It didn't even look at the language of the contract. Don't you think that's shocking for an insurance company to want — In which case are you referring to, Judge Budol? In Miles. In Miles. Yeah. Well, the Court specifically discussed the property damage sustained by one-person language, and — That it's a matter of policy, we think. It should be all of those claims. I was shocked. But — Well, it was reading the policy which was in front of it, and it specifically discusses — I'm looking for that language in the policy, and I didn't find it. Let me just ask you one other question. I know I'm using up your time, so. One of my concerns was, when I looked at the lawsuit and the underlying lawsuit, it wasn't clear which of those claims applied to Yarborough's work or how much any one of those claims would have been that related to Yarborough's work. Did your client make an analysis so they could see how large was each claim relating to Yarborough's work so they would know which ones were allowable and how much the deductible would be for each of those claims? I would expect they did do some analysis, but I don't know the specifics on that, and it's not on the record. Because if it was a deductible for each claim, then wouldn't they have to analyze each of the 636 claims? They don't have to because it's the writ-out roofing case that we've cited in our reply brief explains that the insurance company has the right to settle claims even if it — even if that's going to end up meaning that the insured has to pay the full settlement amount by way of its deductibles. So even if none of the claims were insurable?  Right. So long as they were potentially insurable, and they were definitely potentially insurable in this case, the point of the deductible is it avoids the time and expense of litigating the conclusion in each one of these claims to find out did they in fact have, you know, covered property damage to other property. And that was the specific situation that was addressed in the writ-out roofing case. Thank you. Did you want to save some time for rebuttal? Yes, I'll save time for rebuttal. Okay. Thank you. I'll give you an extra minute or so. Thank you. Good morning. I'm William Alexander. I represent the Yarborough parties in this action. Welcome to Justice Siler from Kentucky, and thank you for the opportunity to be here. I haven't been here before, even though I'm kind of up there in age. Your Honors, at first glance, this looks like it's a simple issue. As the Court has already discerned based upon the questions I've heard this morning, the Court has found out that it is not so significant or so simple. For example, in this particular case, we need to not simply look at the question of how many deductibles can probuilders collect as a result of its indemnification claim for breach of contract under the single construction project. We have to go a bit behind that. And again, in this particular case, what we're looking at is, and it will be helpful just for a couple moments to explain, we're looking at a general contractor who's constructing a residential subdivision. Yarborough is a subcontractor that provides plastering work for that general contractor. The contract between Lenox and Yarborough mandated that Yarborough procure an insurance policy that named Lenox as an additional insurer. What was that to cover? Excuse me, Your Honor. What was this supposed to cover? Specifically indemnification. Okay. For example, in the policy, as argued in the briefs, the because of language makes it rather clear that's what's being contemplated in the policy is a claim for indemnification brought by Lenox in the future. But in addition to the indemnification, Lenox is named as an additional insured under the policy, right? Exactly. So all of this claim language could certainly refer to the claims that the homebuilders are bringing to Lenox, couldn't it? Isn't it equally susceptible to that interpretation? It is. And, in fact, Lenox, as an AI or an additional insured, had a right as an insured to pursue pro-builders for the very claims that it chose not to pursue. So why should it make a difference? They could have tendered the claims, the original class complaint, to pro-builders, I assume. It's a little difficult to tell in the contract. Why should it make a difference that they brought they did exactly the same thing by bringing a cross-complaint naming Yarborough? And I think that goes back to why they took the action they did. Looking at the insurance contract itself, it is essentially a risk-free, cost-free insurance policy issued by pro-builders. And what I mean by that is by pro-builders controlling the litigation, settling it without consent of Yarborough, by choosing the actions it chose to take, in essence, it could recover every penny that it spent both on settlement for legal fees and costs and other by virtue of the deductibles. Every penny. Now, pro-builders' position has softened somewhat, saying we're not looking to recover all of our legal defense costs. In fact, we're not looking to recover our entire amount of deductibles, which, of course, would result in a huge profit to them. But we only want to receive the amount of the settlement paid. Well, that's a convenient argument. But in viewing the policy as a whole, we have to look at what does it mean. And here, what it means is that pro-builder has the absolute right at the end of the day to collect $275,000 in premium and receive a 100 percent reimbursement for every penny that it spent on settlement and legal defense costs. Well, not every case will be like this one. So presumably, there could have been damage to the entire community. And I can't imagine what it is, but there's millions. Somebody dies because the wall falls in, and there are millions of dollars of damages. So in that case, the insuring agreement would have been – would have had pro-builders on the hook. And the beauty is, is that certainly there are conceivable alternative factual scenarios that exist, but that's not what happened here. And in this case, remember, that has not been pointed out by pro-builders, is that even their premium cost was adjustable. In other words, if the dollars received by Yarbrough were greater than the amount set forth in the policy, then the premiums are increased, but they're never decreased. There's always a minimum that's due. So in this particular policy, and part of what Yarbrough is arguing, is that there was no benefit conferred to Yarbrough under this policy. Well, this policy concerns claims. Are you saying that if there had been 636 separate claims filed against the contractor, that it would be different or the same thing? I believe that's correct, Your Honor. And specifically, the homeowners – Could you answer, would it be different or the same thing was the question? And I'm interested in the answer, too. Well, I'm not sure. I think – So the 636 homeowners named Yarbrough as another defendant instead of just suing Lenox. And Yarbrough henders these claims to pro-builders. Wouldn't it have been the same thing, that they would have had the 4,000 or 10,000 deductible for each of those 636 claims? I believe if the homeowners directly sued Yarbrough, then, yes, there would be 636 claims. And with a deductible for each one, so the same argument as an illusory insuring agreement. That's correct. And so why should it make a difference that Lenox counterclaimed Yarbrough instead of tendering directly to pro-builders or Yarbrough being a defendant? Because what happened, in fact, was that Lenox was sued by 636 homeowners. Rather than taking other action, Lenox cross-claimed not for the tort damages, they cross-claimed for indemnity and for breach of contract. They did it in three subdivisions and filed three cross-complaints. Under the definition of claim, which includes the words because of property damage, that each one of those three cross-complaint – or, excuse me, counterclaims was a claim, one claim. Well, let's suppose that you had the 636 homeowners sued the primary contractor, that's Lenox, in separate cases, and then it, in turn, sued your client. Is that 636 separate claims or is that three? Again, great question, and I believe we've answered it in the paperwork, but here's the answer. I think that it could be, but it's still subject to the fact that the insurance policy does not provide any benefit to the insured. At the bottom. I'm sorry, Your Honor. At the end. That's correct. At the end of the day. At the end of the day. At the end of the day, the carrier would still collect $275,000 in premiums and not be out of pocket and not have provided any coverage. Now, we don't know whether this type of policy was a blip in the history of the construction industry, but what we do know is that there aren't any other cases out there that talk about it, and the pro-builders have gone to great lengths to say, we're not really an insurance carrier, we're a risk retention company. It doesn't matter because, at the end of the day, the policy is an insurance policy subject to all of California's protections for an insured. And in this particular case, claim, a claim as defined in the policy, means the claim brought by Lenox. So Opposing Counsel cites these Eighth Circuit cases primarily, which say, regardless of the language of the contractor, we interpret the language of the contract to mean not just the single claim but all of the claims that were brought against the third party. All the third party claims that were brought against the building owner, employer, whatever it is. And Opposing Counsel makes a strong argument that we shouldn't be departing from this common understanding. What's your response to that? The painting or the drift spray cases, I think we call them, are certainly unique for the reasons we've described in our brief. But more importantly, I think looking at the Clarendon case gives us a bit more education as to why in this case that type of logic doesn't apply. And again, we have to look at what the contract was between the insurance company and the insured and focus on that issue. The spray painting cases are interesting, but I don't think they're applicable for the reasons that we have outlined in some detail in the brief. The insurance company, if that's what it is, is depending upon this Miles case. What's the difference between that and our case here? Well, in Miles, first of all, I think that, as we pointed out, the definition of a claim was property damage to one person or organization. In our policy, there is no such language that can make it clear that each homeowner after the homes were sold by Lenox would be a claimant as against Yarbrough. What do you make of the language in endorsement 2 on Item 5 that opposing counsel focuses on? Can you explain to me what that means? I found it very confusing. I did as well, Your Honor. And when you look at 5, you have to read it perhaps in the context of 4. And if we look at number 4, it specifically references what I suggested earlier, and that is that the insurance company has the right to not make a claim for all of the money due under the deductible. And so as we're – and I'll go back to 5 in a moment, but as we're examining the insurance contract, you have to ask yourself, why was number 4 put in there when a company can certainly elect, without any language whatsoever, to take less than they're owed? The only logical inclusion of 4 was to make this contract appear to have some substance. In other words, to make it appear that the insurance company had some risk. Because if you read the policy literally, the insurance company can collect all of the money under the deductibles, all of it, and even profit from Yarbrough. So looking at 5, when it says applies equally, I don't know how to argue that except to say it's confusing, it's ambiguous, I'm not certain what it means, and if that's the provision upon which ProBuilders is relying, it's probably the more ambiguous of all of the provisions in the contract. And again, focusing back on one person or one claim, what is a claim? This policy of insurance was designed for Lenox to take advantage of an additional insured status, and it was designed for Lenox to pursue a claim directly as an AI. They didn't. And it was designed to comply with a contractual obligation to provide indemnity to Lenox, which is exactly what occurred here in three separate actions. Now, it's worth just a moment to, if the court will indulge me, to talk about why it's important that ProBuilders did what they did. Had the claims been filed directly against Yarbrough in one of these mass subdivision cases, Yarbrough would not have had a defense. And that is because of the your work or own work exclusion, which says that Yarbrough can't be compensated to redo the work it did poorly to begin with. That's what I was wondering about, the analysis of the claims. It wasn't clear from the complaint that all of the claims, that all of the homeowners had a beef with Yarbrough's work. And also, it seemed like those claims or many of them were not covered. That's correct. And that's one of the fatal mistakes in this case on the part of the insurance company. And I know the company relies upon another case. But going back, just for one moment, Your Honors, if the claims had been made against Yarbrough, the insurance company would have declined to defend under the own work, your work coverage, or excuse me, exclusion. Yarbrough then would have had the opportunity to control the litigation, to decide whether or not it wanted to pay pennies on the dollar to a homeowner to get rid of a claim, to decide whether or not to offer to redo the work. And the economic result of that situation would have been could have been far better for Yarbrough than in this case because there was no incentive. We don't know it because we don't know how much their attorneys' fees and all that would cost, right? Well, conveniently, Your Honor, what the ProBuilders has done is said, no, we don't want to recover those. But they have a right to do so under the contract. And the reason they're not is because it makes the contract look less illusory. It looks like there is some value being conveyed. That's the only reason they're not pursuing fees. If Yarbrough had defended the case, it would have had the opportunity to assess each of the claims and decide which of those had no merit whatsoever, whatsoever. They didn't have that opportunity. But ProBuilders represented Yarbrough at the litigation, right? ProBuilders was tendered the defense and stepped in to represent Lenox in essence. And remember, the settlement was made by ProBuilders contributing money to settle the case against Lenox. So ProBuilders paid money to settle the homeowner's case against Lenox. And so based on your interpretation or their interpretation, they had no incentive to settle for less than what they could recover from Yarbrough. In fact, the real incentive is for ProBuilders to settle the cases and not be concerned whatsoever as to the amount, because they knew they had the right to recover every penny under the contract. There was no incentive for ProBuilders to settle the claims for a low amount because of the rights under the insurance contract. Thank you. Thank you very much. Your Honors, as for ProBuilders' decision to settle the claims, that issue is squarely addressed by the writ-out roofing case. And I would just invite Your Honors to look at the pages that we cited in our reply to the brief. It squarely addresses that issue, explains that the insured has options. They can take it away from the insurance company before the claims are settled. They can get a declaratory relief action. They have options. Going back to our main point, in the Ixop case that we cited in our brief, we explained that it's appropriate for this Court to look to the decisions of other jurisdictions when deciding how California would decide an issue of California insurance law. Every single case that has addressed this type of situation where you have a bunch of property damage claims that are then bundled by one entity and then passed through to the insured, every single case that has addressed that type of situation has found that when you have similar language to what we have here in our per-claim language, it's ambiguous that the deductible applies per damaged property. And I don't believe opposing counsel has really had any real response to the Kent case, the Atlas case, or the Miles case. The Kent case and the Miles case both had very similar language to the per-person or organization language that we have in our endorsement. And the Atlas case did not have that language. It only had the each-and-every-claim language, and it did not even define the term per-claim. And yet the Court in that case still concluded that the endorsement was unambiguous in that case. Sotomayor, were those primarily Eighth Circuit cases I was looking at? They were three different jurisdictions. It was Eighth Circuit, Florida District Court of Appeal, and the Virginia Supreme Court. Finally, even if this Court were to conclude that the policies were ambiguous, then we go to the objectively reasonable expectations of the policyholder. And here, there is no dispute that Yarbrough seriously misrepresented the nature of his work. He represented that he did no work on large-track developments. That makes a tremendous impact on whether a per-occurrence deductible is appropriate or a per-claim endorsement or per-claim deductible is appropriate. He checked the box for per-claim deductible. If he had chosen the per-occurrence deductible, we wouldn't be here because there would be three deductibles owed because there were three occurrences in this case based on the definition of construction project. So based on that, I would ask the Court to reverse the district court in this case. Thank you. Roberts. Thank you. We appreciate your arguments. It's an interesting case, and the matter is submitted at this time. And that ends our session for this morning.
judges: Siler, Paez, Ikuta